In re Barbara Jean PULLEY, Debtor.

Diane Legreide, individually and in her capacity as Commissioner of the New Jersey Motor Vehicle Commission, and Peter C. Harvey, individually and in his capacity as Attorney General of New Jersey, and the State of New Jersey, Appellants/Defendants,

v.

Barbara Jean Pulley, Appellee/Plaintiff.

No. CIV.A.03–CV–3395(JAP).
Bankruptcy No. 97–23436(RG).
Adversary No. 00–3666(MS).

United States District Court,
D. New Jersey.

Dec. 31, 2003.

Peter C. Harvey, Acting Attorney General of the State of New Jersey, Carol Johnston, Deputy Attorney General of the State of New Jersey, Trenton, NJ, for Appellants.

Neil J. Fogarty, Northeast New Jersey Legal Services, Inc., Jersey City, NJ, for Appellee.

## OPINION

PISANO, District Judge.

Diane Legreide, the Director of the Division of Motor Vehicles ("Legreide"), Peter C. Harvey, Acting Attorney General for the State of New Jersey ("Harvey"), and the State of New Jersey (the "State," and together with Legreide and Harvey, "Appellants" or the "State") take this appeal from the Order and Opinion of the United States Bankruptcy Court entered June 25, 2003, which granted summary judgment in favor of Debtor Barbara Jean Pulley ("Pulley" or the "Debtor") and discharged motor vehicle surcharges levied against her by the New Jersey Division of Motor Vehicles ("DMV") under section 523(a)(7) of title 11 of the United States Code (the "Bankruptcy Code"). This Court exercises appellate jurisdiction in this matter under 20 U.S.C. § 158(a). *See Matter of Halvajian*, 216 B.R. 502, 508 (D.N.J.), *aff'd*, 168 F.3d 478 (3d Cir.1998) (citing 28 U.S.C. § 158(a)(1)). For the reasons set forth below, the Court affirms the Order and Opinion of the Bankruptcy Court, and concludes that the DMV surcharges assessed against Pulley were properly discharged.

## I. BACKGROUND

### A. Facts

The basic facts are not in dispute. Based on unpaid parking violations, Jersey City Municipal Court suspended Pulley's driver's license on June 21, 1991. 295 B.R. at 32. Pulley, a resident of Jersey City, was subsequently involved in a car accident on July 15, 1991. *Id.* At the scene of the accident, Pulley was cited for driving without liability insurance, and on September 17, 1991, was convicted in Jersey City Municipal Court of driving without liability insurance and driving with a suspended license. *Id.* The DMV sent Pulley surcharge bills on September 1, 1992, September 1, 1993, and September 1, 1994, which were never paid. *Id.* As a consequence of her failure to pay and in accordance with state law, DMV suspended Pulley's driver's license on both December 27, 1992 and October 17, 1993. *Id.* On February 25, 2000, Jersey City Municipal Court rescinded its June 21, 1991 suspension of Pulley's driver's license, and Pulley sought reinstatement of driving privileges. 295 B.R. at 32. DMV instead allowed Pulley to apply for a learner's permit as a precursor to applying for a driver's license. *Id.* at 33.

On March 24, 1997, Ms. Pulley filed a petition in bankruptcy under chapter 7 of the Bankruptcy Code. *Id.* at 32. On her schedule of unsecured debts, Pulley listed a debt to "NJ MVS Auto Ins Sur & Coll" for DMV surcharges in the amount of $1,000. *Id.* On July 7, 1997, the Bankruptcy Court discharged Pulley from "all dischargeable debts." *Id.* In December 1997, the State advised Pulley to continue payment of her DMV surcharge because the July 1997 discharge did not apply to her in light of a 1995 bankruptcy court ruling that "surcharges are non-dischargeable civil penalties." *Id.* Pulley's bankruptcy case was closed on April 2, 1998. *Id.*

On August 8, 2000, Pulley moved to reopen the case to initiate an adversary proceeding to determine the dischargeability of the DMV surcharges. *Id.* at 33. On

September 29, 2000, the case was reopened and Pulley filed a complaint. *Id.* On June 25, 2003, the Bankruptcy Court granted summary judgment in favor of Pulley and discharged her debt for the unpaid surcharges. *Id.* at 62. The State timely filed a notice of appeal, and oral argument was heard by this Court on November 5, 2003.

### B. The Bankruptcy Court's June 25, 2003 Opinion and Order

In an Opinion and Order dated June 25, 2003, the Bankruptcy Court, Morris Stern, U.S.B.J., granted summary judgment in favor of Pulley and discharged the DMV surcharges levied against her under Bankruptcy Code section 523(a)(7). 295 B.R. at 62. In making his decision, the Bankruptcy Judge considered the development and application of DMV surcharges in the State, the historical context of the Market Transition Facility ("MTF") and the New Jersey Automobile Full Insurance Underwriting Association ("JUA"), whether the JUA and MTF are governmental units, and the flow of bond proceeds. In addition, the Bankruptcy Court examined the legislative history of Bankruptcy Code and relevant public policy concerns, and con- cluded that the DMV surcharges were dischargeable.

Judge Stern examined in detail the history of New Jersey's DMV surcharge system, and explained that "the dischargeability in bankruptcy of DMV surcharges is knotted with the complexity of the State's generation-long automobile insurance dilemma." 295 B.R. at 37. In 1982, the State enacted the New Jersey Automobile Full Insurance Availability Act, N.J.S.A. 17:30E–1 to –24, to reform the insurance system in the State. *Id.* at 33. This legislation created the JUA, and unincorporated nonprofit organization designed to be "an insurer of last resort organized to provide affordable automobile liability coverage" and issued policies in its own name. *Id.* at 33; N.J.S.A. 17:30E–4. JUA was comprised of all insurers that would sell automobile liability insurance in the State, and participation in the JUA was mandatory. 295 B.R. at 33. According to the Bankruptcy Court, JUA's mandatory membership "tends to cast JUA as a private or otherwise nongovernmental enterprise." *Id.* at 41. In addition, Judge Stern noted that the JUA was subject to state taxation. *Id.* Another key component to the 1982 reforms was a system of DMV surcharges that were "were intended to fund, in part, JUA's operation." 295 B.R. at 33. By 1990, the JUA had $3 billion in losses and "was hopelessly insolvent." *Id.* at 33–34; *see also* N.J.S.A. 17:33B–3(a).

In an effort to replace the JUA, in 1990, the State passed the Fair Automobile Insurance Reform Act, N.J.S.A. 17:33B–1 to –63, which created the MTF, another joint insurance underwriting association that had the authority to issue its own policies. *Id.* at 33, 35; N.J.S.A. 17:33b–11. The 1990 legislation created the Guaranty Fund, a funding mechanism into which the DMV surcharges would be deposited. 295 B.R. at 34; N.J.S.A. 17:33B–5. Within the first four years of the MTF's existence, "MTF had added $1.3 billion in losses" to the JUA's already dismal financial condition. 295 B.R. at 33; *see also* N.J.S.A. 34:1B–21.2(a)(9) (projecting MTF's losses at $1.3 billion).

At this point, the Property Liability Insurance Guaranty Association ("PLIGA") became involved. 295 B.R. at 35. PLIGA is "a private, nonprofit, unincorporated legal entity," that is comprised of all insurers licensed to conduct business in New Jersey, and was organized in 1974 to play claims of insolvent carriers. *Id.*; N.J.S.A. 17:30A–6 and –5(f). PLIGA "was compelled to make loans to the Guaranty

Fund, initially for JUA debt, at the rate of $160 million per year from 1990 through December 31, 1997." *Id., see also* N.J.S.A. 17:30A–8. "PLIGA has loaned over $1 billion to fund part of JUA's and then MTF's debt." 295 B.R. at 40 (citing N.J.S.A. 17:30A–8(a)(10)).

In 1994, the State legislature adopted the Good Driver Protection Act ("GDPA"), N.J.S.A. 34:1B–21.1 to –21.15. 295 B.R. at 35. The GDPA "provided MTF deficit funding on a bulk and immediately available basis through New Jersey Economic Development Authority ('EDA') bonds," and the DMV surcharges were redirected to service this bond debt. *Id.* at 36. Specifically, state statute empowered the EDA to issue Market Transition Facility bonds to secure payment of the current and anticipated liabilities and expenses of the MTF. *Id.* at 36, N.J.S.A. 34:1B–21.4. "In redirecting the DMV surcharges to pay the MTF bonds, the legislature relegated payment of the PLIGA loans to a date uncertain, following repayment of the bonds." 295 B.R. at 36 (citing *Affiliated FM Ins. Co. v. State,* 338 N.J.Super. 540, 556–62, 770 A.2d 741 (N.J.Super.Ct.App.Div.2001)). Initially, $665 million in bonds would be issued and repaid from DMV surcharge revenues at a rate of $85 million per year. *Id.* at 44; Legislative Statement following N.J.S.A. 34:1B–21.1. According to the statute, the MTF bonds could be sold at a public or private sale, and are not an obligation or debt of the State, or any agency or instrumentality of the State. 295 B.R. at 36; N.J.S.A. 34:1B–21.5, –21.9.

Under current law, DMV surcharges are to be used to service MTF bonds until the bond debt is discharged. 295 B.R. at 36 (citing N.J.S.A. 34:1B–21.4); *see also* N.J.S.A. 17:29A–35b(2). Funds in excess of the amount required to be used to service the MTF bonds are remitted to the

State's General Fund. 295 B.R. at 36–37; N.J.S.A. 34:1B–21.7(b). "After 1994, the surcharges became the sole source of service of MTF bonds, and will in the future fund repayment of more than $1 billion of PLIGA loans." 295 B.R. at 45. The Bankruptcy Court pointed out "that this ultimate remittance (at its maximum less than half of annual surcharge appropriations) supports its State benefit contention." 295 B.R. at 37 n. 19.

The Bankruptcy Court then considered whether MTF and JUA were "governmental units" under the Bankruptcy Code. *Id.* at 45. Applying the Eleventh Amendment sovereign immunity test as articulated by the Third Circuit in *Christy v. Pa. Turnpike Comm'n,* 54 F.3d 1140, 1144 (3d Cir. 1995), Judge Stern concluded that MTF and JUA are not arms of the State, nor are they a governmental units. *Id.* at 45–54. In addition, the Bankruptcy Court examined the legislative history of Bankruptcy Code section 101(27) which defines "governmental unit," and subsequent case law. *Id.* at 54. According to the relevant legislative history, section 101(27)

> defines "governmental unit" in the broadest sense. The definition encompasses the United States, a State, Commonwealth, District, Territory, municipality or foreign state, and a department, agency, or instrumentality of any of those entities. "Department, agency, or instrumentality" does not include entities that owe their existence to State action such as the granting of a charter or a license but that have no other connection with a State or local government or the Federal Government. *The relationship must be an active one in which the department, agency, or instrumentality is actually carrying out some governmental function.*

*Id.* at 54–55 (quoting H.R. Rep. No. 95–595, at 311 (1977), U.S.Code Cong. & Admin.News 1978, 5963, 6268; *see also* S.Rep. No. 95–989, at 24 (1978), U.S.Code Cong. & Admin.News 1978, 5787, 5810) (emphasis in original). In light of this legislative history, Judge Stern determined:

> though the Commissioner [of Insurance]'s service as a liquidator has been found to be a hybrid of both private and public characteristics, *In re Liquidation of Integrity Ins. Co.*, 165 N.J. [75,] 90–91, 754 A.2d 1177 [(N.J.2000)], the *entity function* of MTF is both as a nonprecedent setting market-opening joint underwriting association and as a liquidation medium. Neither function is governmental in nature.

*Id.* at 55 (emphasis in original). The Judge further noted that in the legislative history, Congress provided illustration: "[t]he United States trustee, even though an employee of the United States, *is not a governmental unit when he is representing an estate in a bankruptcy case.*" *Id.* (quoting H.R. Rep. No. 95–595, at 311 (1977), U.S.Code Cong. & Admin.News 1978, 5963, 6268) (emphasis in original). Comparing the Commissioner of Insurance in his or her capacity as a liquidator under this scheme to a United States trustee in a bankruptcy case, Judge Stern concluded that the Commissioner is not a governmental unit and that MTF and JUA are not governmental in function. *Id.* at 55–56.

The Bankruptcy Court then addressed some of the State's specific contentions. Judge Stern first rejected the State's argument that the EDA is the beneficiary of the surcharge funds. *Id.* at 56–57. Judge Stern concluded that the "EDA here is simply a facilitator, issuing nongeneral bonds backed by the stream of DMV surcharge revenue. Bond proceeds are used to satisfy MTF debt." *Id.* at 56. Examining the relationship between the MTF and DMV surcharges and pointing to statements made in a November 2001 prospectus, the Bankruptcy Court concluded that MTF, and not the EDA, is the beneficiary of the DMV surcharge funds. *Id.* at 57–58.

Judge Stern also rejected the State's claim that its control of the flow of DMV surcharge funds through appropriation preclude discharge under Bankruptcy Code section 523(a)(7) and explained that as a practical matter, annual appropriation is "a foregone conclusion." *Id.* at 58. The Bankruptcy Court further explained that the remittance of surplus surcharge amounts not used to service MTF bond debt to the General Fund does not alter the result. *Id.* at 58–59. Instead, Judge Stern characterized the State as "a contingent beneficiary of the DMV surcharges— a status not sufficient on the fact of § 523(a)(7) to justify that exception to discharge." *Id.* at 59. In addition, the Bankruptcy Court rejected the State's contention that discharge under section 523(a)(7) would impair the exercise of its police power and concluded that "[d]ischarge of DMV surcharges is simply not relevant to the State's enforcement authority to keep roads safe." *Id.* at 60. Finally, discharge of the surcharges, Judge Stern determined, furthers the "overriding purpose" of the Bankruptcy Code, the notion of a fresh start. *Id.* at 60–62.

## II. *LEGAL DISCUSSION*

### A. Standard of Review

■ Federal Rule of Bankruptcy Procedure 8013 provides in pertinent part: "On appeal the district court ... may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed. R. Bankr.P. 8013. A bankruptcy judge's findings of fact "shall not be set

aside unless clearly erroneous." *Id.* The district court shall review a bankruptcy courts conclusions of law *de novo.* *I.R.S. v. Pransky,* 261 B.R. 380, 384 (D.N.J.2001); *see also Brown v. Pa. State Employees Credit Union,* 851 F.2d 81, 84 (3d Cir. 1988).

### B. The "Money Trail": The Collection and Distribution of DMV Surcharges

The State Division of Motor Vehicles collects the surcharge funds at issue. N.J.S.A. 17:29A–35b(2). DMV surcharge funds collected by the DMV between October 1, 1991 and August 31, 1996 were to be deposited into the Guaranty Fund. N.J.S.A. 17:29A–35(b)(2); N.J.S.A. 17:33B–5(a). Funds deposited into the Guaranty Fund and interest earned thereon would be utilized exclusively for the costs of the purposes of satisfying the financial obligations of the JUA. N.J.S.A. 17:33B–5(d).

In 1994, the GDPA created the Market Transition Facility Revenue Fund ("MTF Revenue Fund"), a nonlapsing fund deigned to "pay the principal and interest and premium, if any, on the Market Transition Facility bonds or notes." N.J.S.A. 34:1B–21.7, –21.8(a). Commencing on September 1, 1996, DMV surcharge funds were to be deposited into this new MTF Revenue Fund. N.J.S.A. 17:29A–35(b)(2). MTF bonds issued by the EDA "shall be payable solely from the monies in the [MTF] Revenue Fund." N.J.S.A. 34:1B–21.5. State law provided that "[t]he bonds or notes shall be secured wholly or in part by the monies in the Market Transition Facility Revenue Fund," which was initially funded by the DMV Surcharge Fund. N.J.S.A. 34:1B–21.4, –21.7, –21.14. By the State's own admission, "MTF Revenue Fund monies may not be used for any other EDA project." (Brief of Appellants

at 6.) DMV surcharge funds "may be appropriated to the Facility Revenue Fund by the Legislature," N.J.S.A. 34:1B–21.7(b), however, State law compels this flow of surcharge funds "until such a time as all the Market Transition Facility bonds, notes and obligations . . . are discharged and no longer outstanding." N.J.S.A. 17:29A–35b(2). After the MTF debt is repaid, "moneys collectible under this subsection shall, subject to appropriation, be remitted to the New Jersey Property–Liability Insurance Guaranty Association . . . to be used for payment of any loans made by that association to the New Jersey Automobile Insurance Guaranty Fund . . .; provided that all such payments shall be subject to and dependent upon appropriation by the State Legislature." *Id.* Amounts not used to pay debt service are remitted to the General Fund. N.J.S.A. 34:1B–21.7(d).

### C. Dischargeability Under 11 U.S.C. § 523(a)(7)

Under chapter 7 of the Bankruptcy Code, a debtor is often entitled to receive a discharge of his or her debts. 11 U.S.C. § 727. There are, however, exceptions to discharge, which are contained in Bankruptcy Code Section 523. 11 U.S.C. § 523(a). The proponent of an exception to discharge bears the burden of proving the exception. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Pulley,* 295 B.R. at 60. Exceptions to discharge are strictly construed against creditors and liberally construed in favor of debtors. *In re Cohn,* 54 F.3d 1108, 1113 (3d Cir.1995).

At the heart of the issue before this Court is the exception to discharge contained in Bankruptcy Code section 523(a)(7). Under section 523(a)(7), a debt is nondischargeable if it is (1) a fine, penalty, or forfeiture, (2) payable to and for the

benefit of a governmental unit, and (3) not compensation for actual pecuniary loss. 11 U.S.C. § 523(a)(7). It is the second component of this standard, whether the DMV surcharges levied against Ms. Pulley is payable to and for the benefit of a governmental unit, that is at issue in this case.

There are a series of recent cases from various Courts of Appeals that discuss the parameters of dischargeability under section 523(a)(7). In 1995, the Fourth Circuit decided *U.S. Dep't of Housing and Urban Dev. v. Cost Control Mktg. & Sales Mgmt. of Va., Inc.*, in which it examined Bankruptcy Code section 523(a)(7) in the context of a civil disgorgement order entered by a court during the course of fraud litigation. 64 F.3d 920, 927 (4th Cir.1995) [hereinafter, *"Cost Control Marketing"*]. According to that court, HUD measured its disgorgement remedy by the amount lost by the victims of the fraud. *Id.* Although HUD stated on the record that it intended to reimburse the victims, the court noted that "the final judgment orders payment to HUD and imposes no obligation on HUD to disburse the money to anyone." *Id.* Explaining that "the Supreme Court has given § 523(a)(7) a broad reading and has held that it applies to all criminal and civil penalties, even those designed to provide restitution to injured private citizens," the Fourth Circuit concluded that the debt was nondischargeable under section 523(a)(7). *Id.* at 927–28 (citing *Kelly v. Robinson*, 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986)).

In *In re Towers*, 162 F.3d 952 (7th Cir.1998), the Seventh Circuit Court of Appeals, dealing with a similar issue, concluded that civil restitution to be paid to victims of the debtor's fraud was dischargeable under section 523(a)(7). Focusing on the language of 523(a)(7) "payable to *and for the benefit of* a governmental unit," the *Towers* court ex-

plained that the state was obligated to distribute the funds to the victims. *Id.* at 955–56. Although "the judge did not state in so many words that the Attorney General must redistribute to the victims whatever can be squeezed out of Towers," taking into consideration a law which provided for the victims' participation in the distribution of assets "under the direction of the court," the Court of Appeals determined that the state had no discretion with regard to distribution of the funds. *Id.* Further articulating the meaning of 523(a)(7), the Seventh Circuit explained: "the context in which the word 'benefit' appears— *'payable to and for the benefit of a governmental unit'*—implies that the 'benefit' in question is the benefit of the money that is 'payable to' the governmental unit." *Id.* at 956. The court distinguished its case from the Supreme Court's decision in *Kelly v. Robinson*, because "[i]n *Kelly* the government received and kept the money; not so here." *Id.*

In 2000, the Third Circuit considered these issues and concluded that the debtor's restitution obligation should be discharged under 523(a)(7). *In re Rashid*, 210 F.3d 201, 203 (3d Cir.2000). Quoting *Towers*, the Third Circuit explained that where the state collects a debt from a citizen for redistribution to "private creditors," it is difficult to prove that the debt satisfies the second prong of the 523(a)(7) analysis, *i.e.*, that the debt is payable to and for the benefit of a governmental unit, *even where the funds pass through a government account. Id.* at 207–08 (emphasis added). Adopting the reasoning of the *Towers* court, the Third Circuit explained that "[t]he word payable clearly casts an economic light over the phrase that suggests that the benefit must be conferred from the monetary value of the debt to be paid by the defendant and not the more

abstract benefit of criminal deterrence." *Id.* The court concluded that because the restitution was ultimately payable to private individuals, the debt was dischargeable in his chapter 7 bankruptcy. *Id.*

### III. *ANALYSIS*

■ The question before the Court is whether the DMV surcharges levied against Ms. Pulley satisfy the standard contained in section 523(a)(7) of the Bankruptcy Code, specifically, whether the surcharges at issue are payable to and for the benefit of a governmental unit. The State contends that the DMV surcharges are not dischargeable under Bankruptcy Code section 523(a)(7), based on the flow of those surcharges. The Court disagrees, and finds that the DMV surcharges are not payable to and for the benefit of a governmental unit, and that the surcharges do not meet the 523(a)(7) standard. Accordingly, the Bankruptcy Court's June 25, 2003 Opinion and Order is affirmed.

The Court rejects the State's argument that appropriation renders the debt at issue nondischargeable. The State contends that the DMV surcharge funds are not available for bond debt service without annual appropriation. It argues that "the Legislature is not compelled to make such an appropriation" and that "[a]ppropriation should not be belittled; it is a fundamental power of the Legislature." (Brief of Appellants at 16, 23.) The State further maintains that "[t]here is no legal obligation for the State even to transfer DMV surcharges to the EDA—the monies are 'subject to appropriation.'" (Brief of Appellant at 21.) Because of its control over the funds, the State has argued, the surcharges are "payable to and for the benefit of a governmental unit." The Court does not agree.

In defense of its argument, the State has cited N.J.S.A. sections 17:29A–35b and N.J.S.A. 34:1B–21.7b. Although DMV surcharge funds "may be appropriated to the Facility Revenue Fund by the Legislature," N.J.S.A. 34:1B–21.7b, New Jersey law also requires that DMV surcharge funds be used first to satisfy MTF debt. Specifically, section 17:29A–35b provides:

Commencing on September 1, 1996, or such earlier time as the Commissioner of Banking and Insurance shall certify to the State Treasurer that amounts on deposit in the New Jersey Automobile Insurance Guaranty Funds are sufficient to satisfy the current and anticipated financial obligations of the New Jersey Automobile Full Insurance Underwriting Association, *all plan surcharges collected by the Division of Motor Vehicles under this subsection b. shall be remitted to the Division of Motor Vehicles Surcharge Fund for transfer to the Market Transition Facility Revenue Fund,* as provided in section 12 of P.L.1994, c. 57 (C.34:1B–21.12), for the purposes of section for of P.L.1994, c. 57 (C.34:1B–21.4) *until such a time as all the Market Transition Facility bonds, notes and obligations issued pursuant to that section 4 of that act and the costs thereof are discharged and no longer outstanding.* From the date of certification by the Commissioner of Banking and Insurance that the moneys collectible under this subsection are no longer needed to fund the association or at such time as all Market Transition Facility bonds, notes and obligations issued pursuant to section 4 of P.L.1994, c. 57 (C.34:1B–21.4) and the costs thereof are discharged and no longer outstanding moneys collectible under this subsection shall, subject to appropriation, be remitted to the New Jersey Property–Liability Insurance Guaranty Association created pursuant to section 6 of P.L.1974, c. 17 (C.17:30A–6) to be used for payment of any loans made by that association to the New

Jersey Automobile Insurance Guaranty Fund pursuant to paragraph (10) of subsection a. of section 8 of P.L.1974, c. 17 (C.17:30A–8); provided that all such payments shall be subject to and dependent upon appropriation by the State Legislature.

N.J.S.A. 17:29A–35b(2) (emphasis added). It is the finding of this Court that this language imposes on the State an obligation to disburse the DMV surcharge funds to MTF bondholders before taking any other action; only after the MTF bond obligations are satisfied does the State have influence over the distribution of the funds through appropriation. Moreover, depending on the amount collected in surcharges each year, it is possible for there to be no surplus, and that nothing is transferred to the General Fund. The mere possibility of a turnover of funds to the State *after* the bond debt is serviced does not dictate the Court's decision. This Court is satisfied that under the language of section 17:29A–35b(2) that repayment of MTF debt is not discretionary, and that the surcharge is dischargeable under *Cost Control Marketing, Towers,* and *Rashid.*

This Court adopts the reasoning of the Third Circuit in *In re Rashid,* 210 F.3d 201, 203 (3d Cir.2000), in the context of the dischargeability of DMV surcharges under Bankruptcy Code section 523(a)(7). The surcharges at issue here are first collected by the DMV, not the Department of the Treasury. The money is then deposited into the MTF Revenue Fund, and is dedicated to servicing the financial obligations of the MTF. The funds are used to repay investors, whether private or public, before any surplus reaches the Department of the Treasury. The fact that funds pass through a government is irrelevant here; the State is collecting the debt for service of the MTF debt and redistribution to private creditors. *See* 210 F.3d at 207–08. Accordingly, the Court concludes that the

DMV surcharges do not satisfy the standard set forth in section 523(a)(7).

The legislative history of Bankruptcy Code section 101(27) supports the Court's decision. Although Congress expressed an interest in defining governmental unit "in the broadest sense," the legislative history of section 101(27) also reveals that for an entity to be considered a governmental unit, "[t]he relationship must me an active one in which the department, agency, or instrumentality is actually carrying out some governmental function." H.R. REP. No. 95–595, at 311 (1977), U.S.Code Cong. & Admin.News 1978, 5963, 6268. The main function of the JUA and MTF is as underwriters, issuers of insurance policies, functions that are non-governmental in nature. Like the participation of a United States trustee in a bankruptcy case, the participation of the Commissioner of Insurance in the operation of the MTF does not convert the MTF into a governmental unit. PLIGA's involvement has no effect—the State conceded at oral argument that "PLIGA is not a governmental unit for our purposes here." (Tr. at 6:2–5.)

In addition, the State contends that DMV surcharges collected benefit it and its agencies because the funds are used to pay for State programs, including alcohol-abuse programs. (Brief of Appellants at 4–5, 11, 14.) This use of the DMV surcharges, its accompanying benefits, and the State's control over DMV surcharge funds, however, takes place only after the MTF bond debt is paid and the surplus, if any, is remitted to the General Fund. Because any such benefit occurs after the bond debt is serviced and the funds are distributed to private citizens, it is not relevant here.

The State also argues that a recent change in state law should affect the outcome of this case. The laws at issue are

*P.L.* 2003, *c.* 89, pursuant to which the MTF will be consolidated into PLIGA, and *P.L.* 2003, *c.* 13, whereby MTF bonds will be retired in 2011. (Brief of Appellant at 12 13.) According to the State, when the MTF bonds are retired, "DMV surcharge monies appropriated to the EDA will be used to pay debt service on newly-issued bonds to support the New Jersey Motor Vehicle Commission." (*Id.* at 13.) PLIGA will process remaining claims and perform related administrative duties. (*Id.* at 12–13.) The State claims that "[t]he court's decision creates instability: if the [Bankruptcy Court's] decision is affirmed, DMV surcharge debts will be dischargeable for the next eight years then be rendered nondischargeable starting in 2011, simply because the monies will be used for debt service on different bonds." (*Id.* at 13.) Likewise, at oral argument, the State claimed that the Bankruptcy Court's ruling will cause further confusion in light of bankruptcy procedure. Specifically, the State argued that because a bankruptcy case can be reopened at any time, the State can reopen all chapter 7 matters to deem a debt nondischargeable when changes in the law occur, i.e., in 2011. (Tr. at 24:5–12.)

■ The Court is not persuaded by these arguments. First, it is the role of this Court to adjudicate only the case before it. In making a decision, the Court is not obligated to consider changes in law that may be scheduled to take effect eight years from the date of its decision, particularly in light of the tumultuous history of the JUA, MTF, and insurance surcharge system of the State. Changes in state law can be quite common, and this Court will not rule in anticipation of these future changes. In addition, this District has held that the law that should apply in a dischargeability action is the law as of the date of discharge, *Hudson Cty. Welfare*

*Dep't, v. Roedel,* 34 B.R. 689, 693–94 (D.N.J.1983), which is in this case, the law that was in effect on July 7, 1997. Thus, there will be no confusion as to what law should apply, and the State will not be in a position to reopen cases in 2011 to render DMV surcharges nondischargeable based on changes in the law.

## IV.  *CONCLUSION*

For the reasons stated above, the Court holds that the State has not met its burden of proving the exception to discharge in this case. It is therefore the finding of the Court that the DMV surcharges assessed against Pulley were properly discharged and the United States Bankruptcy Court's June 25, 2003 Order and Opinion is affirmed. An appropriate order follows.

**This case is closed.**